[Cite as *State v. Reynolds*, 2026-Ohio-2599.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO.     C-250700
                                                   TRIAL NO.      B-2503824
     Plaintiff-Appellee,          :

  vs.                                  :
                                                            *JUDGMENT ENTRY*
RICKY MICHAEL REYNOLDS,                  :

     Defendant-Appellant.         :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/8/2026 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *State v. Reynolds*, 2026-Ohio-2599.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,               :       APPEAL NO.   C-250700
                                     TRIAL NO.    B-2503824

    Plaintiff-Appellee,     :

 vs.                       :

                                    *O P I N I O N*

RICKY MICHAEL REYNOLDS,    :

    Defendant-Appellant.   :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 8, 2026


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Jon R. Sinclair*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** Defendant-appellant Ricky Reynolds appeals from his convictions for domestic violence and abduction following a confrontation with an ex-paramour. Raising four assignments of error, he argues that the convictions ran contrary to the manifest weight of the evidence, the trial court erred in rejecting his self-defense claim and in admitting certain photographic evidence, and that he suffered ineffective assistance of counsel. Finding no merit to these arguments, we affirm.

## I. Factual and Procedural History

**{¶2}** Reynolds and F.M. were in a romantic relationship for nearly five years. They shared two children, the older of which was removed from the home due to drug abuse by both parties and emotional abuse between them. At the time of the events described herein, Reynolds and F.M. lived with relatives and their younger child in a large, two-story residence on Old Stephens Road.

**{¶3}** The confrontation underlying the charges arose on or about May 26, 2025. The parties elicited testimony at trial that conveyed widely divergent versions of what led up to the confrontation, how it transpired, and what happened afterwards.

### A. The Narrative Portrayed by the State's Witnesses

**{¶4}** F.M. testified that, by May of 2025, she was ready to end her relationship with Reynolds and move out. Between 11:00 p.m. and midnight on May 26, the two were in their bedroom at Reynolds' stepfather's house discussing the prospect of her leaving. F.M. testified that Reynolds got "very mad very fast" when she told him she wanted to end the relationship. Reynolds implored her to give their family another chance. The discussion went on for two to three hours. When she tried to leave the room, Reynolds pulled F.M.'s hair and pinned her to the floor. After Reynolds calmed down, F.M. crossed the hall and went into their two-year-old daughter's

bedroom. Reynolds followed.

{¶5}    According to F.M., Reynolds became angry again when he saw her viewing TikTok on her phone. He broke her headphones, grabbed her phone, and saw photographs from other men on the phone. Reynolds began punching F.M. in the head. She was holding their daughter at the time, and the child began to cry. At one point, he grabbed F.M.'s toe and twisted it, injuring her foot. F.M. testified she also sustained injuries to her arm trying to thwart Reynolds' attack. This went on for another two hours. F.M. cried out for help during the altercation, but none of the other residents of the house came.

{¶6}    Eventually, Reynolds took the child and ushered F.M. into their bedroom. He locked the door and threatened to hit F.M. if she left the room. He also held her phone so she could not call for help. F.M. was afraid to leave. When Reynolds lay down on the bed with their daughter and fell asleep, F.M. seized the opportunity to escape. The bedroom door lock made a sound loud enough to wake Reynolds when it disengaged. F.M. ran down the stairs and out of the house. Reynolds followed on a bicycle. It was early morning, and the sun was just starting to rise. F.M. shouted to a woman standing out on her porch to call the police and Reynolds told her, "I will knock you out." F.M. approached the woman and Reynolds pedaled off. The woman on the porch refused to call the police because she did not know F.M.

{¶7}    F.M. continued on foot to her sister's house. Her sister transported her to the police station, where she made a report to Corporal James Wickman of the Hamilton County Sheriff's Office. In his trial testimony, Wickman described F.M.'s demeanor as upset, distraught, and very concerned for her child. She told him she was held in the home against her will for two days. Wickman did not directly observe any physical injuries on F.M., nor did he document any injuries in his report. The corporal

testified to his belief that Reynolds was not arrested for weeks after the incident because law enforcement had to search for him.

### B. The Narrative Portrayed by the Defense's Witnesses

**{¶8}** Reynolds testified on his own behalf. He described the house on Old Stephens Road as an eight-to-nine-bedroom residence. Not including him, F.M., and their daughter, there were four adults and four children living in the house at the time.

**{¶9}** According to Reynolds, he and F.M. decided to part ways romantically at some point prior to May 26. Reynolds testified he was in and out of the house trying to earn money for his daughter's birthday by preparing scrap material for sale at his friend Jimmy's house on May 26 and May 27.

**{¶10}** Reynolds explained that he got back home around 1:30 a.m. on May 28. Upon entering the bedroom he shared with F.M., Reynolds found two hypodermic needles on the dresser. He claimed this upset him because his daughter might have gotten ahold of the needles. Reynolds and F.M. argued for about three hours until 4:30 or 5:00 a.m. Reynolds denied arguing about relationship issues. Rather, he was no longer using drugs and wanted F.M. to stop using drugs for their daughter's sake. Reynolds described the interaction between he and F.M. as more of a discussion than an argument.

**{¶11}** According to Reynolds, he lay down to get some sleep and told F.M. to make sure he was awake by 8:00 to 8:30 a.m. to finish the scrapping job at Jimmy's. Unable to sleep, he went into the room across the hall where his daughter was watching TV. Reynolds could not recall the time, but he estimated it was around 6:00 a.m. because the sun was starting to rise. When he entered the room, Reynolds saw a hypodermic needle in his daughter's hand. He immediately took the needle and picked up the child. According to Reynolds, F.M. was sitting on the floor looking at her phone.

She had an open makeup bag next to her with new and used needles inside.

{¶12} Panicked, Reynolds attempted to throw the seized needle out the window while F.M. demanded he give it back. F.M. lunged and closed the window on his finger. He dropped the needle on the windowsill. As Reynolds carried the child out of the room, F.M. continued physically attacking him. He pushed her down to try to get away. F.M. lunged at him and pulled on his shorts, causing him to fall. He was able to use his arms to protect the child from hitting the hardwood floor. The little girl was crying and upset. He stood to pull up his shorts and F.M. kicked him on the shin and she cried out in pain. Reynolds maintained that was how she injured her foot and denied ever twisting her toe.

{¶13} Reynolds took the child into his bedroom and lay down on the bed with her. He told F.M. to make sure he got back up because he had to work. According to Reynolds, they used a baby gate to block the door because there was no lock on the door. Reynolds woke up to the sound of F.M. opening the baby gate. He followed her outside and went after her on a bicycle. He implored her to watch their daughter while he went to work. F.M. "freaked out" and approached the lady on the porch, asking her to call the police. Reynolds testified he was wary of such confrontations because his ex-wife successfully pursued false domestic-violence charges against him. Also, he was on probation and there was a warrant out for his arrest for failure to appear. Reynolds returned home. He acknowledged that he did not get arrested for a while because he was on the run.

{¶14} Reynolds' sister, Ida Annette Alvarez, also testified for the defense. Alvarez resided in the house on Old Stephens Road with Reynolds and F.M. She testified that Reynolds left the house numerous times to work at Jimmy's house on the two days before F.M. left. Jimmy's house was a three-minute walk from their house on

Old Stephens Road.

{¶15} Per Alvarez, on the night of May 26, F.M. left the house on Old Stephens Road after getting into a fight with Reynolds. She did not hear any arguing or anyone screaming for help. Nor did she hear anyone barrel down the stairs. The only thing Alvarez heard was Reynolds yelling out the front door about his daughter getting ahold of a loaded needle when F.M. left.

{¶16} Alvarez testified that she went to the bedroom that Reynolds and F.M. shared the day F.M. left and found five hypodermic needles in the room. With respect to the abduction count, she opined it was not possible that F.M. could have been abducted for two days because Reynolds was gone. According to Alvarez, she saw F.M. come downstairs, get food, and feed the child during that time. Alvarez testified that she returned the daughter to F.M. per Reynold's instruction after F.M. left.

### C. Procedure

{¶17} The Hamilton County Grand Jury handed down a two-count indictment against Reynolds on July 29, 2025. The instrument charged Reynolds with one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree given the allegation of a prior conviction, and one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree. Reynolds timely filed a notice of self-defense prior to trial. The matter was tried to the bench on November 17, 2025, and the court rendered guilty verdicts on both counts. Sentencing was held the following month. The court sentenced Reynolds to three years of community control with intensive supervision, waived financial sanctions, and ordered Reynolds to stay away from F.M. This appeal timely followed.

### II. Analysis

{¶18} As stated, Reynolds levies four assignments of error in challenging the

trial court's judgment. We address each in turn.

## A. Manifest Weight

{¶19}   In his first assignment of error, Reynolds maintains that his convictions were against the manifest weight of the evidence.

{¶20}   A manifest-weight challenge requires this court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and retrial. *State v. Champion*, 2021-Ohio-4002, ¶ 14 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Manifest weight contemplates the State's burden of persuasion. *State v. Brown*, 2025-Ohio-2351, ¶ 17 (1st Dist.).

{¶21}   Because the trier of fact sits in the best position to judge the credibility of the witnesses, we afford substantial deference to the trier's credibility determinations. *State v. Strietelmeier*, 2022-Ohio-2370, ¶ 7 (1st Dist.). The trier of fact is free to believe some, all, or none of the witnesses' testimony. *State v. Ridley*, 2022-Ohio-2561, ¶ 25 (1st Dist.). Finally, reversal on manifest-weight grounds is warranted "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### 1. Domestic violence

{¶22}   The offense of domestic violence is proscribed in pertinent part by R.C. 2919.25(A). The statute provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." Reynolds stipulated to his prior domestic-violence conviction, which enhanced the alleged offense to a felony. In attacking his domestic-violence conviction, Reynolds decries F.M. as a witness bereft of credibility who failed to support that he knowingly caused or attempted to cause

physical harm to her. Rather, according to Reynolds, any physical contact initiated by him was designed to create separation between he and F.M. and thwart her physical attack.

{¶23} Reynolds emphasizes the fact that F.M. admitted to speaking with his ex-wife prior to trial about the domestic-violence charge she successfully pursued against him. He maintains F.M. admitted to having a motive to lie to avoid Hamilton County Job & Family Services ("JFS") removing their daughter from her custody. He further contends that F.M. admitted to being under the influence of Suboxone at the time of the confrontation. Reynolds challenges F.M.'s version of events in view of the fact that she left their two-year-old daughter behind despite his purported physical assault against her and holding her hostage. He emphasizes the fact that Corporal Wickman did not observe any physical injuries on F.M., nor did she show him any. Instead, F.M. arrived with photographs of injuries on the morning of trial which had never been shown to the State or the defense. Finally, Reynolds questions F.M.'s allegation that the hours-long assault occurred in a house full of people who neither heard the melee nor came to investigate.

{¶24} As is often the case in domestic disputes, this was a "he said, she said case." The versions of events offered by the parties were so divergent that only one could be true. Ultimately, the trial court believed F.M. The record does not indicate the court went astray in doing so.

{¶25} Reynolds is correct that F.M. admitted to speaking with his ex-wife prior to trial. Defense counsel posed a question to F.M. on cross-examination about her speaking to Reynolds' ex-wife regarding "how she got a domestic violence to stick on Mr. Reynolds." F.M. replied that Reynolds' ex-wife told her about the things Reynolds had done to her. This, however, was not an admission to strategizing with the woman

on how to pursue false charges against Reynolds.

{¶26} Reynolds similarly twists F.M.'s testimony about JFS and her Suboxone use. Corporal Wickman testified that he contacted 241-KIDS per standard protocol since the incident occurred in front of a child. F.M. testified that JFS visited her at her mother's house two days after the incident. The child was removed and placed in foster care for a time, but F.M.'s mother regained placement of the girl. F.M. did not testify to fabricating the allegations against Reynolds to prevent JFS from removing her daughter from her custody. Rather, she was honest about her history of substance abuse and conveyed her desire to abandon that lifestyle, distance herself from Reynolds, gain an education, and support herself. She acknowledged that part of that path involved Suboxone treatment. She did not testify that the substance affected her behavior on the day in question.

{¶27} Reynolds correctly notes that F.M. left their two-year-old daughter behind when she left the house. Per F.M.'s testimony, she saw an opportunity to flee when Reynolds fell asleep and took it, explaining that Reynolds threatened to hit her if she left the room. She feared for her safety and left in a hurry. She did not take any belongings when she left because her safety was at the forefront of her mind. Corporal Wickman described F.M.'s demeanor as upset, distraught, and very concerned for her child. Her main concern after reaching safety was getting the child back. Per Alvarez's testimony, F.M. contacted her about retrieving the child. So, while F.M. left the child behind, once she was safe the child became her main focus. The trial court found F.M. to be credible in these assertions.

{¶28} Reynolds makes much of the fact that Corporal Wickman did not observe any physical injuries on F.M. and of F.M.'s eleventh hour conveyance of the photographs of her injuries. F.M. testified that she took photographs that same day,

after going to the police station, and again the next day as bruising worsened. The photographs depicted bruises on her swollen foot and on her back, arm, and wrist. F.M. believed her foot was broken, but agreed she did not seek medical care. F.M. also agreed she did not point out her injuries to Corporal Wickman. But Corporal Wickman testified that F.M. did complain of pain in her foot, head, and shoulder. He did not observe any bruises on her. Even so, bruising can take time to appear. F.M. spoke to Corporal Wickman immediately after the incident. That the bruises were not yet visible does not destroy F.M.'s credibility. Again, the trial court chose to believe her testimony about her injuries.

{¶29} Finally, Reynolds questions F.M.'s allegation that the hours-long assault occurred in a house full of people who did not hear anything or come to check on them. F.M. and Reynolds described the house as a large, two-story structure. Including them and their child, there were 11 people living in the house. F.M. cried out for help during the altercation, but no one came. While alarming, this too does not necessarily eviscerate F.M.'s credibility. It is possible that the other members of the household were sound asleep or that they chose to stay out of the argument. Regardless, the trial court chose to believe F.M.'s version of events. This is not surprising given that Alvarez and Reynolds did not come across as highly credible.

{¶30} Reynolds' sister, Alvarez, testified that she wanted to help him but denied she would lie for him. Her testimony was plagued by inconsistency and did not align with Reynolds' version of events. Specifically, her timeline was not consistent regarding which two days Reynolds was out preparing scrap for sale at Jimmy's house and which day F.M. left. Alvarez clearly became flustered and frustrated when the prosecutor attempted to clarify the timeline on cross-examination, offering that she did not know details because there were six children in the house and she had a lot

going on. She also testified that F.M. told her the argument was actually about F.M. chatting with other men online, which was consistent with F.M.'s testimony.

**{¶31}** Reynolds was no more credible than his sister. Unlike Alvarez, Reynolds offered a very tight, seemingly-rehearsed timeline of events from the overnight hours before F.M. left. He denied being upset about the relationship ending. Rather, he indicated the focus of their discussion was F.M.'s continued drug use. Reynolds testified he was angry with F.M. for choosing drugs and not for leaving the relationship. He testified that he was upset because his other children did not have the opportunity to grow up in a house with both parents and that was important to him. Of note, when called to testify as a rebuttal witness, F.M. agreed the argument started because she refused to work on their family. On that front, Reynolds' testimony actually supports F.M.'s narrative.

**{¶32}** Reynolds' characterization of the interaction as a discussion also does not comport with the broader picture of events. He claimed he found hypodermic needles within reach of their daughter in the bedroom. He also claimed he saw their daughter holding a bloody needle in her hand. He ostensibly attempted to throw the needle out the window into the yard to dispose of it, an assertion which defies reason. He did not report any of this to the police. Instead, he fled to evade capture on an open warrant. According to Reynolds, he felt his daughter was safe when he heard JFS took custody of her. The various pieces of his story simply do not add up.

**{¶33}** Reynolds admitted he had a criminal record, which included drug offenses from 2017 and the prior domestic-violence conviction from 2019. He testified that he was wary of domestic-violence allegations because his ex-wife secured a conviction on what he described as fabricated grounds. Reynolds admitted he was on probation for a trespassing charge when the events of this case transpired. He also

admitted he had 17 failures to appear in court, offering that he had no vehicle and no means to get to court. Reynolds testified that there was a warrant out for his arrest for failing to appear for probation at the time in question. He also admitted that he returned home after F.M. left, packed up his daughter, and took her to Jimmy's house to spend time with her before being locked up on the warrant. Reynolds also acknowledged he did not get arrested for a while because he was on the run. He admitted to actively avoiding the police. While Reynolds had no choice but to acknowledge these unsavory facts, they doubtless bore unfavorably upon his credibility.

{¶34} In short, we do not find that the trial court went astray in rendering a guilty verdict on the domestic-violence charge. The court expressly found F.M. to be credible in her testimony and believed that Reynolds pulled her hair, twisted her toes, and inflicted bruises on her arm and shoulder. We agree the testimony credibly establishes that Reynolds argued with F.M. and physically attacked her. The photographs demonstrated F.M.'s injuries, and Wickman testified to F.M.'s distressed demeanor immediately after the attack. Finally, Reynolds was on the run from law enforcement for weeks after. On this record, Reynolds' domestic-violence conviction is supported by the manifest weight of the evidence.

### 2. Abduction

{¶35} The offense of abduction is proscribed in pertinent part by R.C. 2905.02(A)(2). The statute provides that "[n]o person, without privilege to do so, shall knowingly . . . [b]y force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear[.]"

{¶36} Reynolds insists the record is devoid of credible evidence establishing

that he used force or threats to restrain F.M. He notes that F.M. merely expressed "if I tried to leave it would not have gone well" when asked if Reynolds prevented her from leaving. He further points to her testimony that Reynolds "guided her" to the bedroom and "practically made [her] go into the bedroom" as indications of lack of force.

{¶37} During closing arguments, the State argued that F.M. stayed in the bedroom out of fear. Thereafter, the court asked the prosecutor to identify the force or threat used to restrain F.M. The prosecutor replied that F.M. testified the door was locked, which constituted forceful restraint. In announcing its decision, the trial court opined that the abduction charge was "a little bit closer" than the domestic-violence charge. While the court indicated it believed F.M.'s testimony, it opined there was a potential legal issue regarding threat and force. Ultimately, the court found F.M.'s testimony regarding the locked door and her fear that he would harm her if she left to be sufficient to prove abduction.

{¶38} The resolution of this assigned error rests upon conflicting evidence. Reynolds testified there was no lock on their bedroom door. He maintained that was why they used a baby gate to corral their daughter. F.M. testified there was a sliding lock on the bedroom door. Only one could be true, and the trial court believed F.M. Because this comes down to a credibility call, we decline to disturb the trial court's guilty finding. Furthermore, F.M. testified that Reynolds threatened to hit her should she leave the room. This supported the threat element as well. Reynolds' arguments challenging the wording used by F.M. in her testimony do not alter this analysis. Read in context, Reynolds' conduct relative to the abduction charge becomes clear. F.M. testified: "So we fought. I still tried to leave. He practically made me go into the bedroom that we stayed in, and he locked the door and, like, kept threatening if I was

to go out he was going to hit me, stuff like that." After F.M. testified that Reynolds "guided" her to the bedroom, she agreed he was "grabbing ahold of [her]" and "getting in front of her[.]" F.M.'s portrayal of events was thus not as passive as Reynolds would have this court believe.

{¶39} On this record, Reynolds' abduction conviction is supported by the manifest weight of the evidence. Accordingly, we overrule Reynolds' first assignment of error.

### B. Self-Defense

{¶40} In his second assignment of error, Reynolds argues that the trial court erred in finding the State disproved his self-defense claim beyond a reasonable doubt.

{¶41} The elements of a self-defense claim in a nondeadly-force case include proof that (1) the defendant did not create the situation that caused the altercation, (2) the defendant had reasonable grounds to believe, and honestly believed, he was in imminent danger of bodily harm, and (3) the only way to protect himself from danger was the use of force and the defendant did not use more force than was reasonably necessary to defend himself against the imminent danger of bodily harm. *State v. Ridley*, 2022-Ohio-2561, ¶ 15 (1st Dist.). If any one of these cumulative elements is not met, the proponent's self-defense claim fails. *Id.*

{¶42} Under Ohio's current burden-shifting scheme, the defendant must first produce evidence that tends to support he acted in self-defense. R.C. 2901.05(B)(1). Once the defendant satisfies this initial burden, the burden shifts to the State to disprove at least one of the elements of self-defense beyond a reasonable doubt. *Id.*; *State v. Smith*, 2020-Ohio-4976, ¶ 49 (1st Dist.). A reviewing court applies a sufficiency-of-the-evidence standard when assessing whether the proponent met his burden of production and a manifest-weight-of-the-evidence standard when

15

scrutinizing whether the State met its burden of persuasion. *State v. Messenger*, 2022-Ohio-4562, ¶ 26.

**{¶43}** Regarding the first prong of self-defense, Reynolds maintains the record establishes that he was not at fault in creating the situation because F.M. initiated the physical assault by kicking him. Regarding the second prong, he argues that he had reasonable grounds to believe his daughter was in imminent danger of bodily harm because he witnessed her holding a hypodermic needle. Regarding the third prong, Reynolds insists he used only that force which was reasonably necessary to defend himself and the child from the imminent harm posed by F.M. Reynolds avers that the State did not meet its burden to disprove any of these elements beyond a reasonable doubt.

**{¶44}** In announcing its decision, the trial court stated it did not believe Reynolds' testimony about his finger being injured when F.M. lunged at him or that his ensuing actions against her were perpetrated in self-defense. This suggests the court found Reynolds' claim failed on all three prongs. We review whether the trial court properly determined that the State disproved at least one element of Reynolds' self-defense claim beyond a reasonable doubt.

**{¶45}** First, the State elicited credible evidence to support that Reynolds was at fault in creating the situation. As analyzed under the first assignment of error, F.M. credibly testified that Reynolds was angry with her for choosing to leave the family and jealous of her communicating with other men. She further testified that the argument escalated to physical contact when Reynolds pulled her hair, pinned her to the ground, punched her in the head, and twisted her toes, causing bruises which were documented via photographic evidence. The trial court afforded more weight to F.M.'s version of events than to the version portrayed by Reynolds. The weight of that

evidence supports that the State disproved the first prong of Reynolds' self-defense claim beyond a reasonable doubt.

**{¶46}** Regarding the second prong, the State credibly disproved the notion that Reynolds believed himself or his daughter to be in imminent danger of bodily harm. As noted under the first assigned error, his story about finding his daughter holding a hypodermic needle and then attempting to throw that needle out the window was not believable. In the same vein, the assertion that F.M. lunged at him to retrieve the used needle was not credible. Rather, F.M. credibly testified that Reynolds physically assaulted her after their hours-long argument and his discontentment with her decisions. The weight of that evidence supports that the State disproved the second prong of Reynolds' self-defense claim beyond a reasonable doubt.

**{¶47}** Finally, the State elicited credible evidence to disprove that Reynolds used only the amount of force necessary to defend against F.M. As discussed under the prior assigned error, F.M. credibly testified that Reynolds pulled her hair and pinned her to the ground after she refused to stay in the relationship and that he punched her in the head and twisted her toes after viewing the contents of her phone. These assertions were supported by the photographic evidence of bruises on corresponding parts of her body. The weight of that evidence thus supports that the State disproved the third prong of Reynolds' self-defense claim beyond a reasonable doubt.

**{¶48}** Accordingly, Reynolds' second assignment of error is overruled.

### C. Admission of Photographs

**{¶49}** In his third assignment of error, Reynolds contends that the trial court abused its discretion in admitting photographs of F.M.'s injuries at trial. On the morning of trial, the prosecutor explained that both parties indicated discovery was complete at the final pretrial two weeks prior. The prosecutor explained that she had

been unable to communicate with F.M. prior to trial through the contacts provided. The prosecutor was finally able to speak to F.M. for the first time when she showed up for trial. At that time, F.M. handed over eight photographs of her injuries to the prosecutor which had not been provided to the State at any time before trial. The prosecutor argued that, by virtue of filing a notice of self-defense, Reynolds conceded there was a physical altercation.

**{¶50}** Defense counsel objected to the photographs on the grounds that they constituted new, undisclosed evidence. The court asked what counsel needed to do to prepare for trial in view of the new evidence or how the evidence changed his trial preparation. Counsel replied that he was not sure, but he was ready to go forward with trial even if the court admitted the photographs. The court observed that no foundation had been laid for the photographs, so it was not ready to deem them admitted yet.

**{¶51}** The court offered to continue trial to permit the prosecutor to get copies of the photographs to defense counsel. Defense counsel replied that a continuance was not necessary. Counsel indicated he briefly spoke to his client and, rather than continuing trial, the defense was inclined to take copies of the photographs and proceed with trial. Counsel restated his objection for the record. Thereafter, both parties indicated they were ready to proceed.

**{¶52}** During direct examination, F.M. testified that she took the photographs the same day as the incident after going to the police station, and again the next day as bruising worsened. The prosecutor approached and had F.M. look through the stack of eight photographs. Defense counsel renewed his objection, which was overruled. F.M. agreed that the photographs were fair and accurate depictions of the injuries she sustained from the day of and the day after the incident. The photographs depicted

F.M.'s bruised and swollen foot, bruises on her back near the shoulder area, and bruises on her arm and wrist. The photographs were admitted over defense objection.

**{¶53}** We review the trial court's decision to admit the photographs for an abuse of discretion. *State v. White*, 2024-Ohio-2426, ¶ 41 (1st Dist.), citing *State v. Martin*, 19 Ohio St.3d 122, 129 (1985).

### 1. Discovery violation

**{¶54}** First, Reynolds challenges the admission of photographs not disclosed during discovery. He concedes that the State did not commit a willful discovery violation, because F.M. did not convey the photographs to the prosecution until the morning of trial. He summarily concludes that the admission of the photographs nonetheless constituted an abuse of discretion.

**{¶55}** As stated, the trial court offered to grant a continuance to permit defense counsel to review copies of the photographs. This was a reasonable remedy for an unintentional nondisclosure of evidence. *See State v. Darmond*, 2013-Ohio-966, ¶ 31, citing *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987) (discussing the strong preference for imposing the least severe sanction for a discovery violation); *see also State v. Bates*, 2010-Ohio-5636, ¶ 11 (2d Dist.) ("A continuance . . . is a favored method to avoid prejudice that may flow from a failure to provide discovery yet ensure that the charges against an accused are tried timely and fairly."); Crim.R. 16(L).

**{¶56}** Counsel declined the court's proffered continuance and determined to proceed with trial. Counsel expressly stated on the record that this decision was reached after he consulted with Reynolds. Reynolds thus assented to moving forward with trial despite the late disclosure of the photographs. Accordingly, Reynolds invited any error pertaining to the purported discovery violation. *See In re E.L.*, 2019-Ohio-1490 (9th Dist.) (where a party affirmatively consents to a proposed procedure, the

invited error doctrine bars him from obtaining reversal on that basis). Regardless, counsel chose to cross-examine F.M. about her failure to specify her injuries to Corporal Wickman and her failure to pursue medical treatment despite the severity of the injuries (including a fractured foot). This course of action was aimed at attacking her credibility, which—as discussed below—constituted a viable trial strategy.

## 2. Authenticity

{¶57} Next, Reynolds argues that the photographs were not properly authenticated. He cites F.M.'s failure to testify that the subject matter of each individual photograph represented an accurate and fair depiction of how the marks appeared on the days the photographs were taken.

{¶58} Evid.R. 901 governs authentication of evidence. Subsection (A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This court explained that "[t]he authentication requirement is satisfied when the proponent presents foundational evidence or testimony from which a rational [trier of fact] may determine that the evidence is what its proponent claims it to be." *State v. Crossty*, 2017-Ohio-8382, ¶ 29 (1st Dist.).

{¶59} The burden to authenticate evidence is not high. *Id.* Rather, the proponent of evidence must make a prima facie showing of authenticity through direct or circumstantial evidence. *Id.* Photographic evidence may be authenticated via the "pictorial testimony" theory or the "silent witness" theory. *State v. Thyot*, 2018-Ohio-644, ¶ 19 (1st Dist.). Under the "pictorial testimony" theory, a sponsoring witness can testify that the photograph represents a fair and accurate representation of the subject matter based on the witness' personal observation. *Id.; see, e.g., State v. Ollison*, 2016-Ohio-8269, ¶ 48 (10th Dist.). Under the "silent witness" theory, the evidence speaks

for itself and is admissible when there is "a sufficient showing of the reliability of the process or system that produced the photographic evidence." (Citations omitted.) *Midland Steel Prods. Co. v. U.A.W. Local 488*, 61 Ohio St.3d 121, 130 (1991).

**{¶60}** The photographs in the instant case were admitted under the "pictorial testimony" theory through F.M.'s testimony. At trial, F.M. testified that she took the photographs. The prosecutor specifically asked if the photographs constituted a fair and accurate representation of her injuries from the day of and the day after the incident, which she confirmed.

**{¶61}** It appears that Reynolds takes issue with the fact that this statement of authentication was generally directed at all eight photographs. But Ohio case law does not require a separate statement of authentication regarding each individual photograph. *See, e.g., State v. Searles*, 2019-Ohio-3109, ¶ 8-9 (1st Dist.) (witness generally testified that photographs were fair and accurate representations of her injuries); *State v. Thompson*, 2025-Ohio-4359, ¶ 90 (1st Dist.) (evidence admitted under "silent witness" theory, but photographs testified to as a group for authenticity purposes). After eliciting the statement of authenticity from F.M., the prosecution went through each photograph individually and identified the contents for the court. This procedure was sufficient to satisfy the low threshold for authentication of the photographs, and the trial court did not abuse its discretion in admitting them into evidence.

**{¶62}** Finally, Reynolds emphasizes F.M.'s agreement on cross-examination that hypodermic needles can cause bruising and bemoans her failure to clarify whether any of the marks in the photographs resulted from needle usage. The question about needles causing bruises certainly conveyed such an insinuation, which represented another attempt to attack F.M.'s credibility. However, counsel did not follow up with

a question about whether any of the bruises in the photographs were actually caused by needles. This standalone issue raised under the third assigned error in Reynolds' brief does not evince proof of any sort of error.

**{¶63}** Accordingly, Reynolds' third assignment of error is overruled.

### D. Ineffective Assistance of Counsel

**{¶64}** In his fourth assignment of error, Reynolds claims his trial counsel was ineffective for failing to request a continuance after F.M. presented the photographs of injuries for the first time on the morning of trial.

**{¶65}** The right to the effective assistance of counsel is enshrined in both the United States and Ohio Constitutions. *State v. Solorio*, 2022-Ohio-3749, ¶ 33 (1st Dist.), quoting *State v. Evick*, 2020-Ohio-3072, ¶ 45 (12th Dist.); U.S. Const., amend. VI; Ohio Const., art. I, § 10. Trial counsel will not be deemed ineffective unless (1) counsel's performance was deficient, and (2) the defendant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). Regarding the first prong of ineffective assistance, deficient performance is that which falls below an objective standard of reasonableness. *Strickland* at 687-688. Regarding the second prong, a defendant is prejudiced by counsel's performance only if there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Id.* at 694. The failure to satisfy either prong is fatal to an ineffective assistance claim. *Id.* at 697.

**{¶66}** As stated, defense counsel declined the trial court's offer of a continuance after the prosecution brought the newly-disclosed photographs to the trial court's attention. Reynolds argues that counsel was ineffective in failing to request a continuance to investigate the origin and timing of the photographs. He avers that the photographs were the only corroborating evidence of the injuries claimed by F.M.

and, as such, they were central to the State's case. He claims that the timing of the photographs was of crucial import as they appeared for the first time six months after the incident and could have been taken at any time. Reynolds concludes counsel was ineffective in failing to access the digital information connected to the photographs to properly vet the evidence.

{¶67} A licensed attorney is presumed to be competent in Ohio. *State v. Thomas*, 2025-Ohio-1343, ¶ 44 (1st Dist.). Consequently, when reviewing an ineffective-assistance claim, there exists a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Sharkey*, 2025-Ohio-5117, ¶ 14 (1st Dist.), quoting *State v. Daniels*, 2018-Ohio-1701, ¶ 23 (1st Dist.). The defendant must overcome the presumption that the challenged decision was the product of sound trial strategy. *Id.* Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *Id.* Moreover, "[a]ppellate courts must refrain from second guessing the strategic decisions of trial counsel." *Id.*, citing *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

{¶68} Here, as stated, Reynolds and defense counsel consulted about whether to pursue a continuance. Counsel conveyed their conclusion that a continuance was unnecessary and indicated their desire to proceed with trial. This represented a tactical decision. *See State v. Brown*, 2024-Ohio-2148, ¶ 11 (1st Dist.) ("The decision whether to request a continuance after learning of surprise evidence or a surprise witness is a matter of trial strategy."). By virtue of filing a notice of self-defense, Reynolds conceded that the two made physical contact. Moreover, it is plausible that the defense concluded F.M.'s eleventh-hour disclosure of the photographs hurt her credibility. As stated, counsel challenged the photographs via cross-examination of F.M. *See id.* at ¶ 12. In addition, he minimized the photographs during closing arguments in an attempt

23

to further discredit F.M. The fact that the trial did not end in an acquittal does not afford us carte blanche to second guess counsel's strategy. *See id*. Nor is it likely that the result of trial would have been different had counsel pursued a continuance. *See id*. at ¶ 13.

{¶69}   Reynolds' fourth assignment of error is overruled.

### III.  Conclusion

{¶70}   Reynolds' domestic-violence and abduction convictions were supported by the manifest weight of the evidence. In addition, the record contains credible evidence to support that Reynolds did not act in self-defense. Also, the trial court did not err in admitting the photographs depicting F.M.'s injuries. Nor did Reynolds establish that he suffered ineffective assistance of counsel. We therefore overrule all four assignments of error and affirm Reynolds' convictions for domestic violence and abduction.

Judgment affirmed.

KINSLEY, P.J., and CROUSE, J., concur.